### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO** _____ |
| **v.** | : | |
| **FRANK HAMILTON** | : | **DATE FILED:** _____ |
| **MICHAEL JONES** | | |
| **PETER AN** | | |
| **EDWIN BONILLA** | : | **VIOLATION:** |
| **TINA CHEN** | | **18 U.S.C. § 1349 (wire fraud** |
| **JOSEPH GRECO** | : | **conspiracy-one count)** |
| **TIMOTHY PARK** | | **Notice of Forfeiture** |
| **KENNY TRAN** | : | |

### <u>INFORMATION</u>

### <u>COUNT ONE</u>
**(Conspiracy to Commit Wire Fraud)**

**THE UNITED STATES ATTORNEY CHARGES THAT:**

At all times material to this information:

### BACKGROUND

1.     Defendant FRANK HAMILTON was a resident of Simi Valley, California.

Defendant Hamilton purportedly owned or effectively controlled various "shelf" or "dormant"

companies, including Berkeley Marketing Group LLC (BMG), Historic Concepts LLC (Historic

Concepts), and KLMN Little Hands (KLMN).  Shelf companies exist only on paper—these

companies have no functioning business and no employees.  Defendant HAMILTON also

purportedly owned Nubela USA, Inc. (Nubela), a functioning company with little actual revenue

and few actual employees. Defendant HAMILTON submitted loan applications to financial institutions, non-bank lenders, and financial technology companies in the names of these companies and also assisted other individuals in obtaining loans on behalf of their companies, as described in greater detail below.

2.      Barrie Osborne, deceased and previously charged elsewhere, was a resident of Celebration, Florida. Osborne was an accountant and owner of a tax preparation company called Guardian Angel Associates, LLC. Osborne prepared and filed federal and state income tax returns and other tax documents for clients, including defendant FRANK HAMILTON, and himself with the Internal Revenue Service (the IRS), and also assisted clients with loan applications that were submitted to financial institutions, non-bank lenders, and financial technology companies

3.      Defendant MICHAEL JONES was a resident of Azusa, California. Defendant JONES was the purported owner of a shelf company called Foxtrot Systems LLC (Foxtrot Systems). Like defendant FRANK HAMILTON, defendant JONES assisted other individuals in obtaining loans.

4.      Defendant KENNY TRAN was a resident of Rosemead, California, and was the purported owner of a shelf company registered in California, Hornet LLC (Hornet), and owned another California-based company, Trans Logistics LLC (Trans Logistics), which had limited business operations and only one employee.

5.      Defendant TINA CHEN was a resident of Los Angeles, California, and was the purported owner of two shelf companies registered in California, Minnow LLC (Minnow) and Definito LLC (Definito).

2

6.      Defendant TIMOTHY PARK was a resident of Los Angeles, California, and was the purported owner of a shelf company registered in California, Tiburon LLC (Tiburon), as well as two other California-based companies, Boostmore LLC (Boostmore) and BME Bikes LLC (BME Bikes), both of which had limited business operations and no more than one employee at any time.

7.      Defendant PETER AN was a resident of Chatsworth, California, and was the purported owner of a shelf company registered in California, Authora LLC (Authora).

8.      Defendant JOSEPH GRECO was a resident of Simi Valley, California, and was the purported owner of a shelf company registered in California, Aprise LLC (Aprise).

9.      Defendant EDWIN BONILLA was a resident of Los Angeles, California, and was the purported owner of a shelf company registered in California, Domino Group LLC (Domino Group).

10.     Other individuals were purported owners of shelf companies, including Medi Core LLC (Medi Core), Gallio LLC (Gallio), Xoom Asset Management (XAM), and Citizo LLC (Citizo).

**The Small Business Administration**

11.     The Small Business Administration (SBA) was an executive branch agency of the United States government that provided support to entrepreneurs and small businesses.  The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

*The SBA's 7(a) Loan Program*

12.     The SBA's pre-pandemic loan program was designed to assist small businesses and offered pursuant to Section 7(a) of the Small Business Act of 1953 loans to small businesses that might not otherwise obtain financing on reasonable terms and conditions (7(a) Loans). These loans were funded by lenders qualified by the SBA, and the SBA would guarantee the loan for applicants approved by the SBA.  In order to obtain a 7(a) Loan, a qualifying business was required to submit a 7(a) Loan application signed by an authorized representative of the business.  The 7(a) Loan application required the small business to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the 7(a) Loan and to determine the amount of the loan, including certifications regarding: (i) the number of employees; (ii) "total average annual receipts" for the business's latest three complete fiscal years (which are normally found on IRS tax forms); (iii) a demonstrated need for the loan proceeds; (iv) promised use of the funds for a sound business purpose; and (v) no delinquency on any debt obligations to the U.S. government.

## The CARES Act

13.     The Coronavirus Aid, Relief, and Economic Security (CARES) Act was a federal law enacted in March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.

*Paycheck Protection Program*

14.     One source of relief provided by the CARES Act was the authorization of up to

$349 billion in forgivable loans to small businesses for job retention and certain other expenses,

through a program referred to as the Paycheck Protection Program (PPP).  In or about April

2020, Congress authorized over $300 billion in additional PPP funding.  In or about December

2020, Congress expanded and extended the PPP to March 31, 2021, and authorized over $280

billion for additional initial PPP loans for first-time PPP borrowers, as well as second PPP loans

(PPP Second Draw) for smaller and harder hit businesses.  On or about March 30, 2021, as a

result of ongoing economic challenges faced by small businesses, Congress again extended the

PPP to May 31, 2021.

15.     To obtain an initial PPP loan, a qualifying business was required to submit a PPP

loan application signed by an authorized representative of the business.  The PPP loan

application required the business (through its authorized representative) to acknowledge the

program rules and make certain affirmative certifications in order to be eligible to obtain the PPP

loan.  In the PPP loan application, the small business (through its authorized representative) was

required to state, among other things, its: (a) average monthly payroll expenses; and (b) number

of employees.  These figures were used to calculate the amount of money the small business was

eligible to receive under the PPP.  In addition, businesses applying for a PPP loan were required

to provide documentation (generally, a business tax return) to substantiate their payroll expenses.

16.     PPP loan applications were processed by a participating financial institution (the

lender).  If the lender approved a PPP loan application, the lender funded the PPP loan using its

own monies, which were 100 percent guaranteed by the SBA.  Data from the application,

5

including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

17.     Certain PPP lenders provided loan applicants with access to an online PPP portal and offered eligible participants funding through their own customized platforms.  Other brick-and-mortar banks partnered directly with non-bank lenders and financial technology companies to identify, assist, and fund eligible PPP applicants.

18.     As part of the PPP, businesses were required to use PPP loan proceeds on certain permissible expenses, including, among others, payroll costs, interest on mortgages, rent, or utilities.  Additionally, Congress provided for loan forgiveness on the interest and principal of the PPP loan if the business spent the loan proceeds on these expense items within a designated period of time (initially within eight weeks of receiving the proceeds, which period was later extended to twenty-four weeks).  Prior to June 5, 2020, borrowers were required to use at least 75 percent of the PPP loan proceeds on payroll expenses in order to qualify for forgiveness.  After that date, the percentage required to be spent on payroll was lowered to 60 percent.

19.     A PPP Second Draw loan allowed certain borrowers with 300 employees or fewer that previously received a PPP loan to receive a second loan on the same general loan terms as their first PPP loan.  To obtain a PPP Second Draw loan, a qualifying business was required to submit a PPP Second Draw loan application which was signed by an authorized representative of the business.  Like the initial PPP application, a PPP Second Draw loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan, including with respect to its average monthly payroll expenses and number of employees.  Applicants were

required to substantiate these payroll figures, typically by submitting tax returns, which were used to calculate the amount of money the small business was eligible to receive. Additionally, in the PPP Second Draw loan application, the small business was required to demonstrate, among other things: (a) that it previously received a "first draw" PPP Loan and would use (or had used) the full amount only for authorized uses, as described above; and (b) that it had experienced at least a 25 percent reduction in gross receipts between comparable quarters in 2019 and 2020.

*The EIDL Program*

20.    Another source of relief provided by the CARES Act was the expansion of the SBA's Economic Injury Disaster Loan (EIDL) program, which was created before the COVID-19 pandemic and was expanded to address small business owners' needs during the pandemic. Specifically, the CARES Act authorized the SBA to provide EIDL loans of up to $2 million to eligible small businesses experiencing financial disruption due to the COVID-19 pandemic. The CARES Act also authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL (EIDL Advance). The amount of the EIDL Advance was determined by the applicant's number of employees, which the applicant had to certify. The EIDL Advances did not have to be repaid.

21.    To obtain an EIDL and EIDL Advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as the number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster. The applicant was also required to

certify that the information in the application was true and correct to the best of the applicant's knowledge.

## Financial Institutions, Lenders & Service Providers

22.     Customers Bank was a financial institution headquartered in Phoenixville, Pennsylvania within the Eastern District of Pennsylvania.

23.     First Home Bank was a financial institution headquartered in St. Petersburg, Florida.

24.     U.S. Bank National Association (U.S. Bank) was a financial institution headquartered in Cincinnati, Ohio.

25.     Cross River Bank was a financial institution headquartered in Teaneck, New Jersey.

26.     Northeast Bank was a financial institution headquartered in Portland, Maine.

27.     The Bancorp Bank (Bancorp) was a financial institution headquartered in Wilmington, Delaware.

28.     Celtic Bank was a financial institution headquartered in Salt Lake City, Utah.

29.     Bank of America, N.A. (Bank of America) was a financial institution headquartered in Charlotte, North Carolina.

30.     West Town Bank & Trust (West Town) was a financial institution headquartered in North Riverside, Illinois.

31.     The banks described in paragraphs 22 through 30 of this count were authorized by the SBA to participate in the PPP as lenders to small businesses.

32.     Bluevine Capital Inc. (Blue Vine) was a non-bank lender and financial technology company headquartered in Redwood City, California.

33.     American Express Kabbage Inc. (Kabbage) was a non-bank lender and financial technology company headquartered in Atlanta, Georgia.

34.     Fountainhead Commercial Capital (Fountainhead) was a non-bank lender headquartered in Lake Mary, Florida.

35.     Newity LLC (formerly ACAP) (Newity) was a non-bank lender headquartered in Chicago, Illinois.

36.     Blue Vine, Kabbage, Fountainhead, and Newity participated in the SBA's PPP by, among other things, acting as service providers between small businesses and certain lenders. Small businesses seeking a PPP loan were able to apply through these companies, which reviewed the PPP loan applications.  If a PPP loan application received by one of these companies was approved for funding, a partner lender, such as the banks described in paragraphs 22 through 30 of this count, disbursed the loan funds to the applicant.

37.     Blue Vine, Kabbage, Fountainhead, and Newity were authorized by the SBA to participate in the PPP as non-bank lenders to small businesses.

**THE CONSPIRACY**

38.     From in or about January 2018 through in or about August 2021, in the Eastern District of Pennsylvania and elsewhere, defendants

**FRANK HAMILTON
MICHAEL JONES
PETER AN
EDWIN BONILLA
TINA CHEN
JOSEPH GRECO**

**TIMOTHY PARK and**
**KENNY TRAN**

did knowingly and intentionally conspire and agree with each other, Osborne and other persons

known to the United States Attorney to devise and intend to devise a scheme and artifice to

defraud the SBA and the financial institutions and companies named in paragraphs 22 through

30 and 32 through 35, and to obtain money and property by means of one or more materially

false and fraudulent pretenses, representations, and promises, and, for the purpose of executing

such scheme and artifice, to cause to be transmitted by means of wire communications in

interstate and foreign commerce, certain signs, signals, and sounds, in violation of Title 18,

United States Code, Section 1343.

**MANNER AND MEANS**

It was a part of the conspiracy that:

39.     Beginning in or about January 2018, through at least in or about August 2021,

Barrie Osborne and defendants FRANK HAMILTON, MICHAEL JONES, KENNY TRAN,

TINA CHEN, TIMOTHY PARK, PETER AN, JOSEPH GRECO and EDWIN BONILLA, and

other persons conspired to defraud multiple banks, financial technology companies, non-bank

lenders, and the SBA, including but not limited to Customers Bank, a financial institution located

in the Eastern District of Pennsylvania, by knowingly applying for and obtaining 7(a), PPP, and

EIDL loans for companies controlled by defendants HAMILTON, JONES, TRAN, CHEN,

PARK, AN, GRECO, BONILLA, and others through the use of false and misleading

information.

40.     Osborne provided a plan for fraudulently obtaining loans and preventing the SBA,

banks, and others from discovering the scheme to defendants FRANK HAMILTON and

MICHAEL JONES who shared and/or introduced the plan to defendants KENNY TRAN, TINA

CHEN, TIMOTHY PARK, PETER AN, JOSEPH GRECO and EDWIN BONILLA, and others.

The conspirators took multiple steps consistent with Osborne's plan to implement the fraudulent

loan scheme, including the following:

        (a)      Osborne prepared false loan documents for himself and others.  At times,

Osborne dealt directly with loan applicants.  At other times, Osborne created loan applications

for other individuals, including defendants HAMILTON and JONES.  Defendants HAMILTON

and JONES worked directly with Osborne to submit fraudulent loan applications for their own

companies.  Defendants HAMILTON and JONES also assisted other individuals, including

defendants TRAN, CHEN, PARK, AN, GRECO and BONILLA, and others in applying for

loans using fraudulent applications and supporting documents provided by Osborne.

        (b)      Osborne and defendants HAMILTON and JONES assisted defendants

TRAN, CHEN, PARK, AN, GRECO and BONILLA, and others, many of whom did not have an

existing business to use to apply for loans by arranging for the participant to purchase a shelf

company.  This type of company exists only on paper—these companies have no functioning

business and no employees.  The originators of the shelf companies filed all necessary

paperwork and paid all fees required to keep the companies legally active and registered with the

relevant state authority.  After holding these companies for several years, the originators of the

shelf companies sold them to individuals who needed to have a company that appeared to have

been in business for several years in order to qualify for loans or for other purposes.

        (c)      In most instances, participants in the conspiracy opened corporate bank

accounts in the name of the shelf companies.  In many instances, defendants TRAN, CHEN,

PARK, AN, GRECO and BONILLA, and others paid a fee to defendant HAMILTON and

defendant JONES to have websites, telephone numbers, and emails created for their shelf

companies to make them appear to be legitimate functioning businesses.  Also, at various times,

defendants TRAN, CHEN, PARK, AN, GRECO, BONILLA, and others gave access to their

business telephone numbers, business email accounts, and other personal and financial

information to defendant HAMILTON, defendant JONES, and Osborne, so that defendant

HAMILTON, defendant JONES, and Osborne could assist them in the loan application process.

    (d)  Osborne prepared loan applications which falsely stated the number of

years the non-functioning business was owned by the applicant (except in the few cases of

existing functioning businesses), the nature of the business, the revenues and expenses of the

business, the number of employees of the business, the business' payroll expenses, and the

purpose for which the loan would be used.  Osborne sent the completed paperwork directly to the

applicant or to defendants HAMILTON and JONES, who worked with defendants TRAN,

CHEN, PARK, AN, GRECO and BONILLA, and others to complete the actual submission of

the fraudulent documents.

    (e)  In the few instances when a conspirator used a functioning business to

apply for a loan, as defendant TRAN did with Trans Logistics and defendant PARK did with

Boostmore and BME Bikes, the loan application falsely reflected much higher revenue and far

more employees than the companies' actual revenue and employees.

    (f)  At various times, Osborne listed the names of defendants HAMILTON,

JONES, TRAN, CHEN, PARK, AN, GRECO and BONILLA, and others, and/or companies

purportedly owned by the defendants and others, as employees or independent contractors on

false tax return forms submitted with applications by other conspirators.  As a result, in many instances defendants HAMILTON, JONES, TRAN, CHEN, PARK, AN, GRECO, BONILLA and others, and/or their companies' names appeared as employees or as having received non-employee compensation on multiple fraudulent tax returns that the conspirators submitted within the same time period in support of multiple loan applications that different conspirators filed.  For example, in or about April 2020, defendants HAMILTON and AN, along with several shelf companies in the conspiracy (including Aprise, Authora, BMG, Domino Group, Foxtrot, Historic Concepts, Hornet, and Minnow), appeared on false tax returns (Forms 1099-MISC) that Osborne created for Boostmore and that were submitted by or on behalf of defendant PARK.

(g)     Osborne created fake documents to support loan applications, including false bank statements, fictitious tax documents, and, in defendant HAMILTON's case, a fake payroll report for the Nubela PPP application.  Defendants HAMILTON, JONES, TRAN, CHEN, PARK, AN, GRECO and BONILLA, and others used the fake documents Osborne created to support loan applications for each of their companies.  Additionally, defendant HAMILTON created a fake bank statement that he used in support of the Domino Group PPP application.

(h)     With respect to pre-pandemic loans, Osborne generally provided a script to conspirators to use during calls with lenders.  Unbeknownst to the lenders, defendants HAMILTON and/or JONES secretly listened in on telephone calls that took place between other conspirators and lenders so that, when necessary, defendants HAMILTON and/or JONES could text directions to the conspirators on how to respond to the lenders' questions.

13

(i)     Participants in the conspiracy usually applied to several lenders at approximately the same time.  Due to SBA requirements, only one loan could be funded for each type of SBA loan.   Although many of the conspirators' loans were rejected, most of the businesses the conspirators owned received at least one funded loan, and many received several loans, including multiple types of loans for more than one business, as described in greater detail in paragraph 42, below.

(j)     Between in or about March 2018 and in or about March 2021, the conspirators applied for loans totaling approximately $9,441,513, of which approximately $7,088,010 was funded, all by means of interstate wire communications from locations in California to the financial institutions and/or companies described in paragraphs 22 through 30 and 32 through 35, and/or the SBA, including in the following amounts for the following defendants:

i.      Defendant HAMILTON—in addition to assisting other conspirators with their loan applications—applied for five loans totaling approximately $1,558,459, of which approximately $1,290,459 was funded;

ii.     Defendant JONES—in addition to assisting other conspirators with their loan applications—applied for four loans totaling approximately $827,327, of which approximately $627,227 was funded;

iii.    Defendant TRAN applied for five loans totaling approximately $998,419, of which approximately $998,219 was funded;

iv.     Defendant CHEN applied for five loans totaling approximately $1,024,135, of which approximately $766,735 was funded

14

v.        Defendant PARK applied for six loans totaling approximately $1,454,880, of which approximately $924,710 was funded;

vi.        Defendant AN applied for three loans totaling approximately $941,540, of which approximately $591,440 was funded

vii.        Defendant BONILLA applied for three loans totaling approximately $549,465, of which approximately $399,630 was funded; and

viii.        Defendant GRECO applied for two loans totaling approximately $417,162, of which approximately $417,062 was funded.  Defendants HAMILTON and JONES also applied for a third loan for Aprise in defendant GRECO's name but without defendant GRECO's knowledge.

(k)        In some cases, after Osborne learned that some lenders were checking with the IRS to see if the company applying for the loan had actually filed taxes, Osborne prepared additional fake tax returns and had conspirators, including defendants HAMILTON, TRAN, CHEN, PARK and AN, and others take the fake return to an IRS service center to have the return filed and stamped as received by the IRS so the return could be provided to the lender. These false returns showed, among other things, inflated income and, as a result, large amounts of taxes that were due and owing.  In some instances, Osborne would later file an amended return to reduce these fictitious tax liabilities.  For some companies, however, no returns were filed with the IRS, and fake returns were sent only to the lenders in support of the loan applications.

(l)        Participants in the conspiracy, including defendant JONES and defendant HAMILTON on behalf of himself and defendants TRAN, CHEN, PARK, AN, GRECO and

15

BONILLA, and others, generally paid Osborne upfront fees to get the loan application started, and also paid Osborne a "success fee" after the loan funds were deposited into each of the applicants' accounts.   In addition, defendants HAMILTON and JONES, who helped recruit and/or assist conspirators through the process, collected fees for their work.

   (m) To give the false impression that the conspirators were meeting the SBA requirement for PPP loans that certain percentages of the loan funds would be used for payroll, Osborne provided defendants HAMILTON and JONES with fake payroll schedules outlining the amounts that should be transferred as purported payroll expenses for defendants HAMILTON, JONES, TRAN, CHEN, PARK, AN, GRECO and BONILLA, and others' companies that obtained PPP funds.  Defendants HAMILTON and/or JONES then instructed defendants TRAN, CHEN, PARK, AN, GRECO and BONILLA, and others to transfer the majority of loan proceeds they received as a result of their fraudulent PPP loan applications to a business account defendant HAMILTON had for his fictitious business, Historic Concepts, on a bi-weekly basis using the notation "payroll" on their wires.  By making it appear that money was being used for payroll, the conspirators were attempting to avoid detection, and hoped to increase the likelihood that they would qualify for a PPP Second Draw loan and for loan forgiveness.  As a result, defendant HAMILTON often took an equal or greater percentage of the fraudulently obtained loan proceeds than the conspirator who had applied for the loan.

   (n) For example, on or about June 8, 2020, defendant PARK received fraudulent PPP loan proceeds of $245,888 from Customers Bank located in the Eastern District of Pennsylvania.  The funds were deposited into Boostmore's bank account at JPMorgan Chase Bank, N.A. (JPMorgan Chase).  After receiving the fraudulent loan proceeds—and at defendant

HAMILTON's direction—defendant PARK transferred the loan proceeds by wire from Boostmore's account at JPMorgan Chase to defendant HAMILTON's Historic Concepts account at Bank of America in the amounts determined by Osborne, as outlined below.

| On or about Date | Type | Amount | From | To |
|---|---|---|---|---|
| June 24, 2020 | Wire | $49,177.60 | Boostmore | Historic Concepts |
| July 2, 2020 | Wire | $49,177.60 | Boostmore | Historic Concepts |
| July 15, 2020 | Wire | $49,177.60 | Boostmore | Historic Concepts |
| July 30, 2020 | Wire | $49,177.60 | Boostmore | Historic Concepts |

(o)     Shortly after defendant JONES transferred the fraudulent PPP funds from the Foxtrot Systems bank account to defendant HAMILTON's Historic Concepts bank account, defendant HAMILTON returned the funds to defendant JONES as part of defendant JONES' commission for his role in the conspiracy.

(p)     PPP, EIDL, and 7(a) loan proceeds can only be used on legitimate business expenses and loan applicants confirm in their application that the proceeds will be used for these purposes.  Despite confirming their understanding that the loans were only to be used for authorized purposes, defendants HAMILTON, JONES, TRAN, CHEN, PARK, AN, GRECO, and BONILLA used PPP, EIDL, and/or 7(a) proceeds in unauthorized ways and to unjustly enrich themselves by, among other things, trading in the stock market.  In addition, defendant HAMILTON paid off his home mortgage and defendant JONES took luxury vacations and purchased a fleet of used vehicles.

(q)     Additionally, at defendant HAMILTON's direction, defendants TRAN, CHEN, PARK, GRECO and BONILLA, and others, wired 100 percent of the fraudulent EIDL proceeds they received to a business account owned by defendant HAMILTON called "DBA Berkeley Marketing Group, Frank R. Hamilton Sole Proprietor" (the BMG Account).  Defendant

HAMILTON informed these conspirators that he would invest the EIDL proceeds in the stock market and make regular payments to the conspirators from the purported stock market gains so that the conspirators could, at a minimum, service the monthly EIDL payments due to the SBA. For example, in May and June 2020, defendant TRAN received a total of $129,400 in EIDL funds from the SBA for his company, Hornet.  On August 19, 2020, defendant TRAN wired the $129,400 in EIDL proceeds to the BMG Account owned by defendant HAMILTON and on each of September 15, October 15, November 16, December 15, 2020, defendant HAMILTON wired $4,200 from the BMG Account back to the Hornet account.

     41.    Defendants FRANK HAMILTON, MICHAEL JONES, KENNY TRAN, TINA CHEN, TIMOTHY PARK, PETER AN, JOSEPH GRECO and EDWIN BONILLA, and others caused the transmission by means of wire communication in interstate and foreign commerce signals and sounds in multiple ways, including interstate phone calls, emails, use of the Internet and wire transfers of funds, including transmitting fraudulent applications by interstate wire to Customers Bank in the Eastern District of Pennsylvania, which approved at least two loan applications and wired funds on or about May 28, 2020 and June 8, 2020, to accounts controlled by defendants TRAN and PARK, respectively, in California.

     42.    On or about the following approximate dates, defendants FRANK HAMILTON, MICHAEL JONES, KENNY TRAN, TINA CHEN, TIMOTHY PARK, PETER AN, JOSEPH GRECO and EDWIN BONILLA, and others caused fraudulent loan applications to be submitted, seeking a total of approximately $9,441,513 in loan proceeds, by means of wire communications in interstate commerce, to the financial institutions and lenders listed below on behalf of the companies listed below, knowing that those applications were false because they contained

statements that the businesses were functioning when in fact they were not, that the defendants

owned the businesses before they had purchased the businesses, that the companies had

revenues, expenses, employees, and payroll that they did not have, and also because the

applicants submitted false tax returns and/or bank statements with those applications, and/or

gave false answers to questions from lenders.

| Applicant | Company | Bank / Company | Type | Application Date | Funded | Approx. Amount |
|---|---|---|---|---|---|---|
| HAMILTON | BMG | Cross River Bank | PPP | 5/4/2020 | Yes | $ 257,832.00 |
| HAMILTON | KLMN | Cross River Bank | PPP | 5/13/2020 | Yes | $ 363,536.00 |
| HAMILTON | Nubela | Bank of America | PPP | 4/3/2020 | Yes | $ 416,624.00 |
| HAMILTON | Historic Concepts | Cross River Bank | PPP | 5/6/2020 | Yes | $ 252,467.00 |
| HAMILTON | Nubela | First Home Bank | 7(a) | 3/7/2018 | No | $ 268,000.00 |
| HAMILTON / JONES | Aprise | Newity | PPP Second Draw | 3/8/2021 | No | $196,000.00 |
| JONES | Foxtrot | Celtic Bank | PPP | 5/7/2020 | Yes | $ 259,020.00 |
| JONES | Foxtrot | Northeast Bank | PPP Second Draw | 2/22/2021 | Yes | $ 249,707.00 |
| JONES | Foxtrot | SBA | EIDL | 4/10/2020 | Yes | $ 118,600.00 |
| JONES | Foxtrot | First Home Bank | 7(a) | 10/16/2019 | No | $ 200,000.00 |
| TRAN | Hornet | Cross River Bank | PPP | 5/18/2020 | Yes | $ 253,257.00 |
| TRAN | Trans Logistics | Customers Bank | PPP | 5/26/2020 | Yes | $ 298,250.50 |
| TRAN | Hornet | SBA | EIDL | 4/9/2020 | Yes | $ 129,500.00 |
| TRAN | Trans Logistics | SBA | EIDL | 4/13/2020 | Yes | $ 153,000.00 |

| Applicant | Company | Bank / Company | Type | Application Date | Funded | Approx. Amount |
|---|---|---|---|---|---|---|
| TRAN | Hornet | West Town | 7(a) | 9/21/2019 | Yes | $ 164,412.00 |
| CHEN | Minnow | Bancorp | 7(a) | 11/13/2019 | Yes | $ 326,618.00 |
| CHEN | Definito | SBA | EIDL | 4/7/2020 | Yes | $ 91,600.00 |
| CHEN | Minnow | SBA | EIDL | 4/9/2020 | Yes | $ 111,600.00 |
| CHEN | Definito | Celtic Bank | PPP | 5/4/2020 | No | $ 257,200.00 |
| CHEN | Minnow | U.S. Bank | PPP | 6/30/2020 | Yes | $ 237,117.00 |
| PARK | Tiburon | Celtic Bank | PPP | 5/5/2020 | No | $ 529,940.00 |
| PARK | BME | Cross River Bank | PPP | 5/18/2020 | Yes | $ 229,252.00 |
| PARK | Boostmore | Customers Bank | PPP | 5/17/2020 | Yes | $ 245,888.00 |
| PARK | Tiburon | First Home Bank | 7(a) | 4/3/2019 | Yes | $ 250,000.00 |
| PARK | Boostmore | SBA | EIDL | 4/7/2020 | Yes | $ 99,900.00 |
| PARK | Tiburon | SBA | EIDL | 4/7/2020 | Yes | $ 99,900.00 |
| AN | Authora | Cross River Bank | PPP | 5/6/2020 | Yes | $ 467,640.00 |
| AN | Authora | SBA | EIDL | 4/6/2020 | Yes | $ 123,900.00 |
| AN | Authora | First Home Bank | 7(a) | 6/25/2019 | No | $ 350,000.00 |
| GRECO | Aprise | Cross River Bank | PPP | 5/14/2020 | Yes | $ 258,262.00 |
| GRECO | Aprise | SBA | EIDL | 4/14/2020 | Yes | $ 158,900.00 |
| BONILLA | Domino Group | Cross River Bank | PPP | 5/8/2020 | Yes | $ 239,730.00 |
| BONILLA | Domino Group | SBA | EIDL | 4/14/2020 | Yes | $ 159,900.00 |
| BONILLA | Domino Group | Unknown | PPP Second Draw | 3/9/2021 | Unknown | $149,835.00 |

| Applicant | Company | Bank / Company | Type | Application Date | Funded | Approx. Amount |
|---|---|---|---|---|---|---|
| Other 1 | Gallio | Cross River Bank | PPP | 5/12/2020 | Yes | $ 258,577.00 |
| Other 1 | Medi Core | SBA | EIDL | 4/7/2020 | Yes | $ 125,400.00 |
| Other 1 | Medi Core | Kabbage | PPP | 5/28/2020 | No | $ 296,028.00 |
| Other 1 | Medi Core | First Home Bank | 7(a) | 12/7/2018 | Yes | $ 243,405.50 |
| Other 1 | Gallio | SBA | EIDL Advance | 4/7/2020 | Yes | $ 8,000.00 |
| Other 1 | Gallio | SBA | EIDL | 4/7/2020 | No | $ 105,600.00 |
| Other 2 | XAM | Cross River Bank | PPP | 4/30/2020 | Yes | $ 237,115.00 |
| Other 3 | Citizo | First Home Bank | 7(a) | 2/21/2018 (date of note) | Yes | $ 200,000.00 |

All in violation of Title 18, United States Code, Section 1349.

## NOTICE OF FORFEITURE

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

43.     As a result of the violation of Title 18, United States Code, Section 1349 set forth in this information, defendants

> **FRANK HAMILTON**
> **MICHAEL JONES**
> **PETER AN**
> **EDWIN BONILLA**
> **TINA CHEN**
> **JOSEPH GRECO**
> **TIMOTHY PARK and**
> **KENNY TRAN**

shall forfeit to the United States of America any property that constitutes, or is derived from, proceeds obtained directly or indirectly from the commission of such violations.

44.     If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

        (a)     cannot be located upon the exercise of due diligence;

        (b)     has been transferred or sold to, or deposited with, a third party;

        (c)     has been placed beyond the jurisdiction of the Court;

        (d)     has been substantially diminished in value; or

        (e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 982.


_Ronald S Sarach_ for

_____
**JACQUELINE C. ROMERO**
**UNITED STATES ATTORNEY**


_Deborah L. Connor_

_____
**DEBORAH L. CONNOR**
**CHIEF, MONEY LAUNDERING AND**
**ASSET RECOVERY SECTION**
**U.S. DEPT. OF JUSTICE**

**UNITED STATES DISTRICT COURT**

Eastern District of Pennsylvania

<u>Criminal Division</u>

THE UNITED STATES OF AMERICA

vs.

FRANK HAMILTON
MICHAEL JONES
PETER AN
EDWIN BONILLA
TINA CHEN
JOSEPH GRECO
TIMOTHY PARK
KENNY TRAN

INFORMATION

Counts

18 U.S.C. § 1349 (wire fraud conspiracy-one count)
Notice of Forfeiture

A true bill.

_____

Foreman

Filed in open court this _____day,
Of _____A.D. 20_____

_____

Clerk

Bail, $_____